# EXHIBIT 16



Neutral Citation Number: [2021] EWHC 56 (QB)

Case No: QB-2020-002450

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**MEDIA AND COMMUNICATIONS LIST**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 15/01/2021

Before:

**MR JUSTICE JAY**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

**WALTER TZVI SORIANO**                                           **Claimant**

**- and –**

**(1)  FORENSIC NEWS LLC**
**(2) SCOTT STEDMAN**
**(3) ERIC LEVAI**
**(4) JESS COLEMAN**
**(5) ROBERT DENAULT**
**(6) RICHARD SILVERSTEIN**                                       **Defendants**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Greg Callus and Ben Hamer** (instructed by **Rechtschaffen Law Offices**) for the **Claimant**
**Jonathan Price** (instructed by **Gibson, Dunn and Crutcher UK LLP**) for the **First to Fifth Defendants**
**The Sixth Defendant** was neither present nor represented

Hearing dates: 14th and 15th December 2020
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.
**Covid-19 Protocol:  This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and release to Bailii.  The date and time for hand-down is deemed to be Friday 15th January 2021 at 10.00am.**

.............................
MR JUSTICE JAY

## MR JUSTICE JAY:

### Introduction

1.  Mr Walter Soriano ("the Claimant") is a British citizen and habitually resident here. The six Defendants are all domiciled in various States and Commonwealths of the United States of America. Initially, the Claimant made a without notice application to serve his Claim Form and Particulars of Claim out of the jurisdiction. On 30th September 2020 Nicklin J, of his own motion, ordered that the application be heard on notice to the Defendants, obviating the need for any application by them to set-aside in circumstances where it was clear that such an application would be brought.

2.  This is the hearing of the Claimant's contested application to serve-out. It was conducted remotely on the basis of excellent submissions from Mr Greg Callus for the Claimant (leading Mr Ben Hamer) and Mr Jonathan Price for the First to Fifth Defendants. I was provided with transcripts of the proceedings which proved invaluable in the circumstances. Mr Richard Silverstein ("the Sixth Defendant") was neither present nor represented at the hearing, and an issue arises as to whether he was properly served. I will be returning to him towards the end of his judgment.

3.  In a nutshell, the Claimant sues in relation to ten internet publications and various social media postings including on Facebook and on Twitter. He relies on various causes of action including data protection, malicious falsehood, libel, harassment and misuse of private information. This application raises various issues under the rubrics of jurisdiction, the merits and *forum conveniens*, some of which are novel.

4.  The parties have not filed witness statements themselves. The Claimant relies on the witness statements of his solicitor, Mr Shlomo Rechtschaffen, dated 16th August and 9th December 2020, and the First to Fifth Defendants rely on the witness statement of their solicitor, Mr Patrick Doris, dated 30th November 2020. I will be referring to the deponents without any intended disrespect as SR and PD. Both counsel have made valid forensic points about the absence of direct evidence from the parties. PD's statement was filed slightly late but I granted the necessary relief from sanction in view of Mr Callus' sensible stance.

5.  Just before the second day of the hearing, a number of additional documents were submitted on behalf of the Defendants. Although there is no supporting witness statement I have taken these into consideration in the absence of opposition from Mr Callus. However, I have treated the document entitled "List of Sources" with appropriate caution.

### The Parties

6.  The Claimant has been habitually resident in the United Kingdom since 2003 and a British citizen since 2009. He retains his Israeli nationality. His wife, children and grandchildren all live in England. According to SR's witness statement, paras 34 and 41, the Claimant's primary business is in England although he owns properties in Israel and owns a small property investment portfolio in the US. The latter is described as a "passive investment" inasmuch as it is said that the Claimant is not involved in the management of this business. SR also informs the court that "save for business and vacation trips" the Claimant spends his time in the UK. No further detail was provided

by SR and the Defendants' request for further information given on 24th November has not been not answered. PD also gives evidence as to the Claimant's business interests, and I will be reverting to this below.

7.     Forensic News LLC ("the First Defendant") was incorporated as a California limited liability company on 10th May 2019, and was registered as such by Mr Scott Stedman ("the Second Defendant") on that date. The decision to take this step was made in April following discussions with other Defendants. The Second Defendant is the sole member and manager of the First Defendant, and the latter's registered address is the home address of his parents. PD informs the Court, at para 19, that the First Defendant is essentially run out of the Second Defendant's parents' house.

8.     The Second Defendant, aged 24, is described by SR, para 22, as domiciled in California. Neither PD nor Mr Price took issue with this description. After some relevant undergraduate studies, the Second Defendant began writing in journalism in 2017. His main interest has been in the arena of national security. In April 2019 he published a book, *Real News*, on the topic of Russian interference in the 2016 US Presidential election. His object in setting up the First Defendant was to provide freely available investigative journalism on this and similar issues. The First Defendant's website *Forensic News* was formally launched on 20th May 2019. According to its mission statement, "we will never turn a blind eye to reporting that could make an impact".

9.     Mr Eric Levai ("the Third Defendant"), aged 41, is also described as domiciled in California. He was working as a "freelance entertainment professional" until 2016 when his interest in journalism was kindled by the 2016 elections. In February 2018 he launched the "Mueller Time" podcast. In early May 2019 he decided to collaborate with the *Forensic News* team. He has written a number of articles and has produced and hosted a podcast. The Third Defendant also continues to collaborate on an ad hoc basis with other news organisations.

10.    Mr Jess Coleman ("the Fourth Defendant"), aged 26, is described as domiciled in New York. He has pursued an interest in journalism since his high school days. In mid-2019 he "began interactions" with the Second Defendant and then started to collaborate with *Forensic News*, his primary interest being in the Mueller Investigation. Since September 2019 the Fourth Defendant has been working at a law firm and thereafter he worked much less with *Forensic News*, finally ending his involvement in September 2020.

11.    Mr Robert Denault ("the Fifth Defendant"), aged 27, is described as domiciled in Pennsylvania. Between 2018 and 2020 he studied as a law student at Duke University. His interest in journalism began when he was an undergraduate. According to PD, para 68, he became increasingly disappointed in mainstream press coverage on President Trump's financial affairs. This brought him into contact with the Second Defendant, and he began collaborating with *Forensic News* in a part-time investigative research and reporting role. He ended his association with *Forensic News* in August 2020 after taking employment with a New York law firm.

12.    PD's witness statement suggests that the Second to Fifth Defendants are respected journalists, and of good character and reputation. It is pointed out that the podcast has hosted a number of impressive and knowledgeable individuals (para 32). In my view,

that may be so but it is neither possible nor appropriate to determine an application of this nature on generalised assertions about the Defendants' credentials.

13.     There is only very limited information available about Mr Richard Silverstein ("the Sixth Defendant"). Save for some contact with the Second Defendant, he has no links to the other Defendants and para 3 of Mr Callus' skeleton argument accepts that he acted independently. According to his solicitor's letter dated 14th December 2020, he is resident in Washington State. For many years he has been writing a blog focusing on the perceived excesses of the State of Israel. 75% of the readership of his blog is split between the US and Israel, with 5% of the overall readership in the UK.

14.     Apart from brief touristic visits to this country by some of the Defendants, they have no links to the UK.

***The Publications***

15.     Before 5th June 2019, which was the date of the first publication that related to the Claimant, *Forensic News* had published a number of articles on various topics including President Trump's financial affairs and the activities of Psy Group, a private Israeli intelligence company in Ukraine allegedly connected to the Claimant. The parties were ultimately agreed that before 5th June 2019 some 6 articles had been published. Overall, 159 articles have been published to date, all of which remain available online. Of these, only ten (including a podcast and a transcript) refer to the Claimant. The Second Defendant contributed to 83 of these, the Third Defendant to 55, with the remaining Defendants playing a far less significant role. Para 85 of PD's witness statement shows that 74.84% of all visitors to the website originate from the US and 4.57% from the United Kingdom. Para 85 also partitions the US into four States with those in California making the highest number of "hits" (11.77%).

16.     Turning now to the publications that have been sued upon, para 29 of PD's witness statement contains a helpful table providing the dates of publication and the identity of the Defendants involved in them. In short, the first seven publications, including the podcast (Publication 4) and the transcript (Publication 5), were made between 5th June and 1st August 2019. Publication 8 was not made until 16th June 2020. It is not disputed that the libel claim is statute-barred as regards Publication 1.

17.     Para 86ff of PD provides an analysis of visitors to the website in relation to each of Publications 1-8 in a manner similar to para 85, although on this occasion there has been no sub-division as between US States. "Hits" in the US vary between 48.46% to 81.18% and "hits" in the UK vary between 5.53% and 35.9%. The UK is always in second-place. Analysing this in more quantitative terms, paras 84-96 of PD's witness statement reveals that Publication 5 was accessed 14 times in the UK and Publication 2 1,398 times. The other publications fall within these parameters.

18.     Para 19 of SR2 provides a quantitative analysis of Publications 1-8 on the basis of sub-dividing the US into three jurisdictions, California, New York and Pennsylvania. On that basis England and Wales is in first place on four occasions, and California in first place on four others (with England and Wales coming in either second or third).

19.   Publications 9 and 10 have been addressed separately. These were published on the Silverstein website on 30th January and 14th February 2020 respectively. It is said that the Sixth Defendant was responsible for these publications.

20.   I have read the Publications, which are quite short, and the transcript of the podcast, which is quite long. It is unnecessary to dwell on the detail because, although PD has informed the court that the defence of public interest to the libel claim will be pleaded, it is obviously not possible at this stage to make any merits assessment without evidence. Suffice it to say that, by way of preliminary assessment, the Publications appear to make extremely serious allegations against the Claimant at various *Chase* levels (including level one) asserting, for example, that he is the "thug" of the current Prime Minister of Israel, has close and corrupt links to the Russian State and various individuals of note, is guilty of multiple homicide, has received illegal "kickbacks", has been convicted of corruption in Monaco, is part of a money laundering operation and makes illegal arrangements for corrupt oligarchs and public figures. Mr Price's skeleton argument describes these publications as "very far from hit pieces". I am not sure quite what he means by that, but on any view they amount to a sustained assault on the Claimant and his reputation.

21.   Appendix 2 to the Particulars of Claim collects together 432 tweets and Facebook posts which are relevant to the harassment claim. The tweets are (perforce) pithy entrées to the various publications which are then hyperlinked. The Facebook posts are equally terse. These have been analysed in the same way as the Publications, and the results are broadly comparable.

*The Claims*

22.   Mr Callus' skeleton argument helpfully summarises the various claims in the following way.

23.   The claims in data protection are brought against all the Defendants for all ten Publications. It is unnecessary to specify the Data Protection Principles which have allegedly been breached because the Defendants do not put these in issue at this stage. The claims are brought on the basis that the Claimant is a data subject, the First Defendant and the Second Defendant are data controllers, and the remaining Defendants are data processors, save that the Sixth Defendant is the data controller of the Silverstein website.

24.   The claims in malicious falsehood are brought only against the First Defendant and the Second Defendant in respect of Publications 1-8. The claims are limited to publication in England and Wales. The basis of the contention that these publications were not merely false but made maliciously will be examined in further detail below.

25.   The claims in libel are brought against all the Defendants in respect of Publications 2-8. The claims are limited, as they must be, to publication in England and Wales.

26.   The claims under the Protection from Harassment Act 1997 are brought against all the Defendants in respect of all the publications, including what is described as "the torrent of social media posting". Although this is advanced as a global claim, the Claimant's harm is said to have been sustained in England and Wales.

27.     The claims for misuse of private information are brought against all of the Defendants, again on a global basis with the harm suffered occurring in England and Wales. It is alleged that the Defendants have placed the Claimant's personal data, including sensitive personal data, into the public domain. This claim is tethered to the publications sued on as well as a limited number of photographs of the Claimant which were allegedly stolen from social media accounts.

28.     It is not clear to me on what basis it is said that the First to Fifth Defendants were involved in Publications 9 and 10, which are pleaded as being the responsibility of the Sixth Defendant who posted them on a different website. Given that Mr Callus appears to concede that the Sixth Defendant was acting independently of the others, no claim in conspiracy or joint tortious liability seems capable of being put forward, except that in relation to the harassment claim it is contended that all of the Defendants aided and abetted the Second Defendant. Turning the matter on its head, the Sixth Defendant's responsibility for Publications 1-8 has not been satisfactorily explained either. Para 5 of Mr Price's skeleton argument makes a number of valid points all bar one of which Mr Callus did not seek to address. As for that, I simply cannot accept Mr Callus' submission that s.7(3A) of the 1997 Act takes the matter any further. As regards the Second to Fifth Defendants, the Claimant is entitled to say that they acted in concert with one another irrespective of this sub-section. As regards the Sixth Defendant, I cannot interpret s.7(3A) as bringing him within the net in circumstances where it is not suggested that he acted in concert with any of the other Defendants.

### *The Issues*

29.     In the light of the parties' written and oral arguments, I consider that the following issues arise for my determination in the following order. Here, I am working from para 25 of Mr Price's skeleton argument subject to my slight reordering and textual refinement.

30.     The first issue is whether there is a basis on both jurisdiction and the merits for the claim is data protection under the GDPR.

31.     The second issue is whether the claim in malicious falsehood has a real prospect of success.

32.     The third issue is whether the claim in harassment has a real prospect of success.

33.     The fourth issue is whether the claim in misuse of private information has a real prospect of success.

34.     The fifth issue is whether, for the purposes of s.9 of the Defamation Act 2013, the courts of England and Wales are clearly the most appropriate place in which to bring an action in respect of the Publications.

35.     The sixth issue is whether the courts of England and Wales are clearly the most appropriate place to try such of the claims that may have survived the merits test.

### *Some Preliminary Observations*

36.     There was a large measure of agreement between Mr Callus and Mr Price as to the legal principles which govern jurisdiction, the merits and *forum conveniens*. At this stage I

will seek to summarise the common ground, identifying the limited areas of contest for subsequent discussion and analysis.

37. In respect of the various causes of action sued upon, the Claimant relies on the jurisdictional gateways set out in CPR Practice Direction 6B under para 3.1(20) (for the data protection claim), para 3.1(9) (for the libel, malicious falsehood and harassment claims), para 3.1(21) (for the misuse of private information claim), and para 3.1(2) (for all the claims, because injunctive relief is sought).

38. Mr Price accepts that the jurisdictional gateways are fulfilled (or, at least, sufficiently fulfilled for present purposes) save in respect of the data protection claim. For completeness, though, it should be recorded that the test the court must apply to resolve a jurisdiction question on an interim basis such as this is the "good arguable case" criterion as clarified by the Supreme Court in *Four Seasons Hotel v Brownlie* [2017] UKSC 80, [2018] 1 WLR 192, at para 7. Mr Price drew attention to para 40 of my judgment in the recent decision of *Napag Trading Ltd and others v Gedi Gruppo Editoriale and another* [2020] EWHC 3034 (QB) which does no more than venture to encapsulate higher authority. The burden of proof, or of persuasion, lies on the Claimant to satisfy the "good arguable case" test, which in this context means "the better of the argument".

39. There was no issue between counsel as to the merits test. The burden of proof is on the Claimant and the test can be expressed in terms of the summary judgment jurisdiction under CPR Part 24: is there a real, as opposed to a fanciful, prospect of success on the claim? The authorities vouching the question being posed in these terms are familiar, and have been collected in the White Book at para 6.37.15.

40. I will defer examining s.9 of the Defamation Act 2013 because a number of discrete issues arise in this regard.

41. As for classic *forum conveniens* (s.9 of the 2013 Act may be conceptualised as setting forth a special rule for *forum conveniens* in libel actions only), the leading authority is *Spiliada Maritime Corporation v Cansulex Limited ("The Spiliada")* [1987] AC 460, in particular the opinion of Lord Goff between 478E-482A. In short:

  (1) the burden is on the Claimant to show that England and Wales is clearly or distinctly the most appropriate forum.

  (2) the court is required to determine which jurisdiction is the most appropriate: if not England and Wales, the application for service-out must fail.

  (3) the question is not to be answered simply with reference to the relief claimed: such relief may be peculiar to the courts of England and Wales, and will skew the exercise.

  (4) the court will examine the whole dispute between the parties and will not confine itself to the parameters in which it has been framed by the claimant.

42. The burden referred to by Lord Goff is a legal burden, but as Hamblen J (as he then was) explained in *AstraZeneca UK Ltd v Albermarle International Corp* [2011] EWHC 1574 (Comm), [2011] 1 All ER (Comm) 510, at para 35, the standard of proof is not

the balance of probabilities but whether the claimant has the "better of the argument". Although the "*much* better argument on the material available" test has been superseded, the onus is on the Claimant to show that he has the better of the argument that England and Wales is clearly or distinctly the most appropriate forum.

43.    In *Altimo Holdings & Investment Ltd v Kyrgyz Mobile Tel Ltd* [2011] UKPC 7, [2012] 1 WLR 1804, the Privy Council addressed the test under CPR r.6.37(3) which is that the Court must be satisfied that England and Wales is the "proper place in which to bring the claim". This means that our courts must be "clearly or distinctly the appropriate forum for a trial". The object of the exercise is to "identify in which forum the claim could be most suitably tried for the interests of all the parties and for the ends of justice".

44.    There is an important dispute between the parties on one issue which bears both on s.9 of the 2013 Act and classic *forum conveniens*. The issue may be formulated in these terms: is there an evidential burden on the Defendant to show that another forum is available and appropriate; and, if so, is expert evidence required to discharge it? I will defer answering this question until I come to the Fifth Issue.

### The First Issue: the Data Protection Claim

45.    Jurisdiction for the data protection claim is conferred by article 79(2) of the GDPR. This is the relevant provision for the purposes of para 3.1(20) of CPR Practice Direction 3B. Article 79(2) provides:

> "**Right to an effective judicial remedy against a controller or processor**
>
> 1.  Without prejudice to any available administrative or non-judicial remedy, including the right to lodge a complaint with a supervisory authority pursuant to Article 77, each data subject shall have the right to an effective judicial remedy where he or she considers that his or her rights under this Regulation have been infringed as a result of the processing of his or her personal data in non-compliance with this Regulation.
>
> 2.  Proceedings against a controller or a processor shall be brought before the courts of the Member State where the controller or processor has an establishment. Alternatively, such proceedings may be brought before the courts of the Member State where the data subject has his or her habitual residence, unless the controller or processor is a public authority of a Member State acting in the exercise of its public powers."

46.    I cannot accept Mr Price's submission that article 79(2) is in some way subordinated to article 3. The latter, as will soon be seen, defines the "territorial scope" of the GDPR, but in my judgment article 79(2) addresses the logically prior question, or anterior gateway, of whether the data protection regime applies to this claim at all. The first sentence of sub-article (2) is expressed in mandatory terms, the second sentence is

permissive. The policy of the GDPR is that someone who is habitually resident in a Member State should have the option to sue there rather than anywhere else. This is so even if the controller or processor has an establishment elsewhere. So, the second sentence of sub-article (2) is applicable whether or not the first sentence is fulfilled.

47.     Mr Callus submitted that the Claimant has a good arguable case that the First and Second Defendants have an establishment in England and Wales. It is unnecessary to decide whether this is so for the purposes of the jurisdictional gateway question because the same issue arises under article 3 of the GDPR where the standard of proof is lower from the Claimant's perspective. It is also because there can be no dispute that the Claimant satisfies the habitual residence limb, which is the alternative jurisdictional springboard for bringing proceedings.

48.     The merits limb engages article 3 of the GDPR, the Defendants confining their objection to this provision alone. Article 3 provides:

> "**Territorial Scope**
>
> 1.   This Regulation applies to the processing of personal data in the context of activities of an establishment of a controller or a processor in the Union, regardless of whether the processing takes place in the Union or not.
>
> 2.   This Regulation applies to the processing of personal data of data subjects who are in the Union by a controller or processor not established in the Union, where the processing activities are related to:
>
> (a) the offering of goods or services, irrespective of whether a payment of the data subject is required, to such data subjects in the Union; or
>
> (b) the monitoring of their behaviour as far as their behaviour takes place within the Union."

49.     The Recitals to the GDPR do not assist on the meaning of "established" and "establishment" in the Union. However, recitals (23) and (24) throw light on article 3.1. In particular:

> "(23) … In order to determine whether such a controller or processor is offering goods or services to data subjects who are in the Union, it should be ascertained whether it is apparent that the controller or processor envisages offering services to data subjects in one or more Member States in the Union. Whereas the mere accessibility of the controller's, processor's or an intermediary's website in the Union, of an email address or of other contact details, or the use of a language generally used in the third country where the controller is established, is insufficient to ascertain such intention, factors such as the use of a language or a currency generally used in one or more Member States with the possibility of ordering goods and

services in that other language, or the mentioning of customers or users who are in the Union, may make it apparent that the controller envisages offering goods or services to data subjects in the Union.

(24) … In order to determine whether a processing activity can be considered to monitor the behaviour of data subjects, it should be ascertained whether natural persons are tracked on the internet including potential subsequent use of personal data processing techniques which consist of profiling a natural person, particularly in order to take decisions concerning her or him or for analysing or predicting her or his personal preferences, behaviours and attitudes."

50.     Mr Callus drew my attention to three decisions of the CJEU on the predecessor data protection directive, namely Directive 95/46. These are: *Google Spain SL v Agencia Espanola de Proteccion de Datos (AEPD)* [2014] QB 1022 ("*Google Spain*"), *Weltimmo sro v Newzeti Adatvedelmi es Informacioszabadsag Hatosag* [2016] 1 WLR 863 ("*Weltimmo*") and *Verein fur Konsumerentenininformation v Amazon EU Sarl* (2017] QB 252 ("*Amazon*").

51.     The facts of *Google Spain* were that Google set up a subsidiary in Spain which was intended to promote and sell advertising space there. Google Search had its seat elsewhere. The CJEU held that the relevant processing did not have to be carried out by the establishment itself, here the Spanish entity, because the test was "in the context of" (para 52). That criterion was satisfied because (1) Google Spain was established in a Member State, (2) its activities were intended to promote and sell advertising services in that Member State with a view to rendering the search engine more profitable, and (3) it was involved in orienting the controller's commercial activity towards those living in Spain. It followed that these commercial activities were inextricably linked to Google's core business and were therefore generated "in the context of" it (paras 55 and 56). In my view, *Google Spain* is not a case about the meaning of "established" or "establishment", and has only marginal relevance to the current issues.

52.     The facts of *Weltimmo* were that a Slovakian company operated a website dealing in Hungarian properties. *Weltimmo* therefore differed from *Google Spain* inasmuch as there was no branch or subsidiary in the Member State in issue. However, the website was written in Hungarian and the company had a representative there as well as a letter box and bank account. The CJEU held that (1) the absence of a branch or subsidiary was not the determining factor (para 28), (2) the test for "establishment" would be satisfied if there was "any real and effective activity – even a minimal one – exercised through stable arrangements" (para 31), and (3) "both the degree of stability of the arrangements and the effective exercise of the activities in that other Member State must be interpreted in the light of the specific nature of the economic activities and the provision of services concerned" (para 29).

53.     Paras 29 and 31 of *Weltimmo* provide particular assistance in the instant case. Even though minimal activity exercised through stable arrangements is the key issue, the factual features of *Weltimmo* – physical presence and a website with a specific Hungarian orientation - were very much stronger than ours.

54.     The facts of *Amazon* were that the company, registered in Luxembourg, was carrying out commercial sales in Austria where it had no registered office or establishment. In my view, paras 72-79 of the CJEU's judgment do no more that apply *Google Spain* and *Weltimmo*. The issue for the national court would be whether Amazon's activities in Austria arose in the context of its core business in Luxembourg.

55.     Some further assistance is to be found in the European Data Protection Board's *Guidelines 3/2018 on the Territorial Scope of the GDPR*. These Guidelines are persuasive, not binding, and in the context of "establishment" add little to the jurisprudence I have already summarised. The absence of a branch or subsidiary is not determinative. The presence of one single employee may be sufficient to satisfy the "stable arrangement" threshold, but mere presence to that extent will not trigger the GDPR if the processing in question is not carried out in the context of the activities of the EU-based employee.

56.     I was taken to no authority on article 3.2. Here, the Guidelines are of greater assistance.

57.     As regards article 3.2(a):

> "… In addition to being applicable only to processing by a controller or processor not established in the Union, the targeting criterion largely focuses on what the processing activities are "related to", which is to be considered on a case by case basis.
>
> The EDPB stresses that a controller may be subject to the GDPR in relation to some of its processing activities but not subject to the GDPR in relation to other processing activities. …
>
> …
>
> When taking into account the specific facts of the case, the following factors could therefore inter alia be taken into consideration, possibly in combination with one another:
>
> -  The EU or at least one Member State is designated by name with reference to the good or service offered;
>
> -  The data controller or data processor pays a search engine operator for an internet referencing service in order to facilitate access to its site by consumers in the Union; or the controller or processor has launched marketing and advertisement campaigns directed at an EU country audience;
>
> -  The international nature of the activity at issue, such as certain tourist activities;
>
> -  The mention of dedicated addresses or phone numbers to be reached from an EU country;

- The use of a top-level domain name other than that of the third country in which the controller or processor is established …;

- The description of travel instructions from one or more other EU Member States to the place where the service is provided;

- The mention of an international clientele …;

- The use of a language or currency other than that generally used in the trader's country …;

- The data controller offers the delivery of goods in EU Member States."

58.    As regards article 3.2(b):

"… the EDPB considers that tracking through other types of network or technology involving person data processing should also be taken into account in determining whether a processing activity amounts to a behavioural monitoring, for example through wearable and other smart devices.

…

The EDPB does not consider that any online collection or analysis of personal data of individuals in the EU would automatically count as "monitoring". It will be necessary to consider the controller's purpose for processing the data and, in particular, any subsequent behavioural analysis or profiling techniques …

…

The application of article 3.2(b) … could therefore encompass a broad range of monitoring activities, including in particular:

- Behavioural advertisement

- Geo-location activities, in particular for marketing purposes

- Online tracking through the use of cookies …

- Personalised diet and health analytics services online

- CCTV

- Market surveys and other behavioural studies based on individual profiles

- Monitoring or regular reporting on an individual's health status."

59.     The Claimant's case on article 3.1, as pleaded in para 17 of the Particulars of Claim against the First and Second Defendants, is that the publications are in English; the website solicits donations in Sterling and in Euro; the website includes a "store" with its own branded merchandising, accepting shipping addresses in the UK; and a tweet sent on 7th August 2020 invited pledges to Patreon, a subscription platform, from readers in the UK and the EU. In oral argument Mr Callus stressed that the bar he had to surmount was very low – an arguable case of there being minimal activity through stable arrangements. He submitted that the Patreon subscriptions were stable inasmuch as they remained in place until cancelled.

60.     The Claimant's case on article 3.2(a) is that the Defendants, to the extent that they are data controllers, offer services to readers in the UK irrespective of payment. As for article 3.2(b), it is contended that the website places cookies on readers' devices and processes their personal data using Facebook and Google analytics for the purpose of targeting advertisements, with Facebook Ireland Ltd and Google Ireland Ltd operating as the registered joint data controller. Further, Mr Callus submitted that the Defendants were collecting and obtaining data about the Claimant and were monitoring his behaviour within the UK and the EU with a view to making publishing decisions.

61.     Para 38 of PD's witness statement avers that between August and November 2020 three one-off donations originated from the UK and that between May 2019 and October 2020 there were three Patreon subscriptions originating from here. It is not clear whether there were any one-off UK subscriptions or Patreon subscriptions before August 2020. This second point is relevant in view of the timing of the tweet. PD also suggests, by implication at least, that no other revenue was generated from the UK or the EU.

62.     In his submissions, Mr Price urged me to decide the issue definitively rather than determine whether or not the Claimant had a real prospect of success. He submitted that the evidence falls far short of meeting the test for an establishment under article 3.1, and that a careful application of the EDPB Guidelines should lead me to the conclusion that there is no arguable case on article 3.2 either.

63.     I decline Mr Price's invitation to determine the issue one way or the other at this stage. The issue for me is whether the Claimant has demonstrated a real prospect of success on the merits: for these purposes, on either or both parts of article 3 of the GDPR. In my judgment, the Claimant falls short of doing so.

64.     As for article 3.1, the absence of a branch or subsidiary in the UK is by no means determinative (*pace* Mr Price's skeleton argument). However, it is relevant that the First Defendant has no employees or representatives in this country. The fact that *Forensic News* has a readership in the UK which is not minimal is of no more than marginal relevance: by itself, it could not begin to satisfy article 3.1. It is clear that the First Defendant's journalistic endeavour is not oriented towards the UK in any relevant respect. That the content of the First Defendant's website may be of interest to some readers here is not germane to the issue under consideration, nor is the fact that the Claimant holds joint British nationality. The real question is whether, taking the Claimant's case at its reasonable pinnacle, he has persuaded me that he has the sufficient makings of an argument on "stable arrangements" to enable him to pass through the merits portal. I cannot accept the proposition that less than a handful of UK subscriptions to a platform which solicits payment for services on an entirely generic

basis, and which in any event can be cancelled at any time, amounts to arrangements which are sufficient in nature, number and type to fulfil the language and spirit of article 3.1 and amount to being "stable". To the extent that it improves the Claimant's case slightly, the 7th August tweet post-dated all of the publications sued on.

65.     For the purposes of article 3.1, it is unnecessary to consider whether the processing at issue was "in the context of" the activities of a controller or processor established in the EU. The Claimant's case falls at the first hurdle.

66.     As for article 3.2(a), there is nothing to suggest that the First Defendant is targeting the United Kingdom as regards the goods and services it offers. That this country is a potential shipping destination for merchandise which in the event does not appear to have been purchased by anyone here (save possibly for one baseball cap) does not in my opinion fulfil sub-para (a) as explained in the EDPB Guidelines. No more than a cursory examination of their listed indicia serves to demonstrate how far short the Claimant comes in meeting this sub-para.

67.     I also accept Mr Price's submission that the clause "are related to" is narrower and stricter than the phrase "in the context of". As the EDPB has observed, a data controller may be subject to the GDPR in respect of some of its processing activities and not others. The Claimant must demonstrate that the activity in sub-para (a) (sc. the offering of goods and services) is related to the First Defendant's core activity, namely its journalism; and in my judgment it is not. It is not enough for the Claimant to show that the First Defendant may have carried out some processing which is related to the offering of goods and services in this jurisdiction (I have concluded that it has not), or that such processing may have been in the context of what I am characterising the First Defendant's core activity.

68.     As for article 3.2(b), I can accept that the Claimant has an arguable case that the First Defendant's use of cookies etc. is for the purpose of behavioural profiling or monitoring, but that is purely in the context of directing advertisement content. There is no evidence that the use of cookies has anything to do with the "monitoring" which forms the basis of the Claimant's real complaint: the Defendant's journalistic activities have been advanced not through any deployment of these cookies but by using the internet as an investigative tool. In my judgment, that is not the sort of "monitoring" that article 3.2(b) has in mind; or, put another way, the monitoring that does properly fall within this provision – the behavioural profiling that informs advertising choices – is not related to the processing that the Claimant complains about (assuming that carrying out research online about the Claimant amounts to monitoring at all).

69.     I therefore conclude that the Claimant has no arguable case under the GDPR. I should add for completeness that had I reached a different conclusion on the merits I would have found in favour of the Claimant on *forum conveniens*. Mr Callus rightly points out that the claim under the GDPR would have to be brought in the courts of a Member State of the EU. There is nothing to suggest that England and Wales would have been other than the most natural and appropriate forum for trial, and no evidence that such a claim could be brought in the US.

***The Second Issue: the Malicious Falsehood Claim***

70. This claim is advanced in two ways. The first may be described as the straightforward route, and requires proof of "malice" (or, more precisely in this context, persuading me that the Claimant has a real prospect of proving it at trial) as defined by Lord Diplock in the *locus classicus* of *Horrocks v Lowe* [1975] AC 135, pages 149-51. In short, the Claimant must show either (1) publishing words knowing them to be false, or without an honest belief in their truth or being reckless as to their truth or falsity, or (2) publishing words actuated by a dominant improper motive towards him. The second pathway may be described as *Loutchansky* malice, and requires proof that the First and Second Defendants continued to publish without amendment or clarification after clear and categorical denials had been made.

71. The parties were in agreement on the law governing what I am designating the straightforward route, but in deference to their careful submissions I should mention two more recent authorities. In *Huda v Wells* [2017] EWHC 2553 (QB), [2018] EMLR 130, Nicklin J, at para 70, equated malice to dishonesty and stated that recklessness could include "complete indifference". Further, it was necessary to identify the mind of the specific individual who was said to be malicious. Mr Callus invited me to read the whole of Saini J's judgment in *Qatar Airways Group Q.C.S.C. v Middle East News FZ LLC* [2020] EWHC 2975 (QB), in particular paras 199-215. I confess that I have not studied the facts of that case in any detail, but I can agree with Mr Callus that Saini J provides a valuable summary of the operative legal principles at paras 193-195 in particular.

72. In support of the straightforward route, Mr Callus relied on the following pieces of evidence which he invited me to consider cumulatively. What Mr Callus sought to do was to construct a complex evidential skein which includes an Israeli journalist, Raviv Drucker, an Israeli website, *Seventh Eye*, and one of its staff writers, Oren Persico, and an American journalist, Natasha Bertrand, who is the national security correspondent for *Politico*, a website based in the US. He submitted that "the following facts and matters admit only of conspiracy or coincidence to a remarkable degree".

73. For my summary of the evidence on which the Claimant relies, I am able to rely heavily on Mr Callus' skeleton argument, taking on board the additional points he raised in oral argument as well as some of the material set out in PD's witness statement.

74. On 28th November 2018 the Second Defendant was second by-line with Ms Bertrand in a piece for *Atlantic* magazine. On 14th April 2019, just as she moved to *Politico*, Ms Bertrand praised the Second Defendant on Twitter and plugged his book. On 19th April 2019 the Drucker defence in the libel proceedings brought by the Claimant in Israel was filed (see para 41.3 of SR's witness statement). The Claimant's case is that the Second Defendant founded the First Defendant on 20th April although it was not formally incorporated until 10th May. *Seventh Eye* began publishing material from the Drucker case on 23rd and 24th April.

75. The Claimant was invited by the US Senate Intelligence Committee to testify in connection with its investigation into the 2016 US Presidential Election. The letter of invitation was then leaked to Ms Bertrand who published what PD describes as a "major report" on the Politico website at 2.57pm EDT on 5th June. The article mentioned, amongst other things, that the Senate Committee was interested in speaking with the Claimant about his alleged connections to Deripaska and Israeli intelligence firms.

76. The parties appear to be in agreement that before 5th June the Claimant was a largely unknown figure. According to Ms Bertrand, he was "virtually a ghost" online. Mr Callus points out that he had only once before been quoted in Anglophone media, as a spokesman for Diego Maradona.

77. According to PD (see para 80 of his witness statement), the Second Defendant decided that *Forensic News* "should investigate and potentially publish reporting concerning the Claimant". Before then, the Claimant was unknown to the Defendants (para 77). Publication 1 was published at 4.15pm on 5th June. It proclaims itself as a "*Forensic News* exclusive" and carries details of business dealings, property ownership and "a 2018 Israeli news exposé". Mr Callus makes much of the fact that on his arithmetic only 3 hours and 18 minutes elapsed between the Bertrand piece in *Politico* and Publication 1. This is calculated on the basis that 4.15pm should be understood to be "mountain time" in the US because the relevant location was Utah. Mr Price, who is working (presumably on instructions) from Pacific Standard time, calculated that the intervening period was in fact 4 hours 18 minutes.

78. According to para 17 of SR's second witness statement, 57% of the articles published by Forensic News in June and July 2019 were about the Claimant, including 80% of those written by the Second Defendant.

79. On 8th July 2019 the Second Defendant emailed Mr Drucker inviting his collaboration or informal assistance with "a big piece" he was writing on the Claimant. There is no evidence that Mr Drucker replied. Mr Callus submitted that this is implausible, that Mr Drucker must have responded, and that the First and Second Defendants are suppressing evidence.

80. Publication 2 took place on 14th July. According to one of the Second Defendant's tweets posted that day, it was the result of a week long investigation. He also tweeted that "we looked at 20+ years of business records, real estate transactions, court records and more". Mr Callus drew attention to the text of Publication 2 and invited me to draw the inference that Mr Drucker must have been a source. He does not feature in the "List of Sources" supplied by the Defendants during the course of the hearing unless he is the anonymous source appearing under "Russia experts", which I doubt.

81. On 16th July Mr Persico contacted the Second Defendant by email. This was unsolicited, and arose because Mr Persico had read Publication 2. In the first email Mr Persico said that he had seen that the Claimant had threatened to sue him, and wanted to write a piece about him. A second email will be addressed below. According to para 116 of PD's witness statement:

> "I am instructed that the email exchange which ensued constituted the entirety of the communications between the Second Defendant and Mr Persico, save for sporadic and direct brief messages between them on the Signal messaging platform (perhaps numbering a dozen messages or so over a number of months, prompted by the appearances of [the Claimant's] name in mainstream news articles) which are no longer available to the Second Defendant."

PD does not explain why these messages are no longer available. There are a number of possibilities, once of which being that they were deleted intentionally to cover up tracks. Mr Callus invited me to draw an adverse inference in line with the principle in *Armory v Delamarie* [1722] 1 Strange 505.

82.   On 17th July *Seventh Eye*, through Mr Persico, published on its website all the documents it had on the Claimant. On the same day he emailed the Second Defendant a hyperlink to the website.

83.   Publication 3 took place on 19th July. The Claimant's case is that this was the start of a "special series" focusing on him. It was based on the *Seventh Eye* archive. Mr Callus observes that Publication 3 occurred less than 48 hours after the hyperlink had been sent. It resulted in "a series of articles whose speed of publication was apparently not inhibited by much of the Archive constituting court documents written in Hebrew".

84.   Mr Callus' overarching submission was as follows:

> "The Claimant's case is that none of the above is a coincidence. For the reasons set out in his pleading, he contends that the Second Defendant created the First Defendant at the behest of Raviv Drucker (whether directly or indirectly, including operating through Mr Persico of Seventh Eye) with a view to laundering the Claimant's information into the public domain."

85.   In the Particulars of Claim this is characterised as the fulfilment of Mr Drucker's threat to unleash "the Armageddon Plan" because the Claimant had refused to discontinue the Israeli libel proceedings.

86.   Mr Callus also drew attention to Publication 5, which is the transcript of a podcast dated 22nd July 2019. In it the Fourth Defendant accepted that the allegation that the Claimant had made real estate purchases for the purposes of money laundering is "all speculation", although the circumstances are sufficient to generate scepticism and raise suspicion. Further, the Second Defendant added:

> "So we have all these dots pretty much saying that [the Claimant] is close to Netanyahu and we have all you know, at this point we have like 10 reference points of him being close to Netanyahu, which is just super, super interesting given his connections to the Russian government. And this is just a web of connections that the Senate is certainly looking into. And I'd be surprised of the FBI wasn't looking into him as well.
>
> …
>
> … it's interesting with [the Claimant] like these Russians that I've studied for the past two years and all these, you know, shady money laundering people, they usually don't put their name to the LLC like they'll have a lawyer in the country to do that … But there's a good chance that he has a ton of money invested in the UK and we don't know whose money it is."

Mr Callus relies on other sections of the transcript which I have also considered.

87.  The evidence in support of *Loutchansky* malice falls within a narrow compass. On 15th May 2019 the Second Defendant sent SR a request for comment. It is said by the Claimant that the request was responded to in its entirety "with definitive answers by the Claimant's lawyer and the Second Defendant was made ambiguously aware of the falsity of the allegation" (see para 40 of the Particulars of Claim). In my judgment, SR's response email timed at 19.11pm on 15th May 2019 is extremely brief and does virtually nothing more than answer the Second Defendant's questions in the negative. There is other correspondence in exhibit SR1 which is similarly terse. Mr Callus also relied in this context on the fact that the report of the US Senate Intelligence Committee had very little to say about the Claimant, yet the Defendants publishing campaign did not abate.

88.  In oral argument Mr Callus submitted that it simply could not be said that the Claimant has failed to put forward an arguable case of malicious falsehood based on the entirety of this material. Mr Callus further submitted that I should have regard to the sheer number of falsities perpetrated, the gross failures to fact-check before publication, and the aggravated and hostile tone of some of the pieces, including the "glee" which attended the publication of photographs. A tweet which accompanied one of these publications announced that it was understood that the Claimant hated having his photograph taken.

89.  Mr Price submitted that the Claimant's case is constructed on a conspiracy theory and unrestrained speculation. His "List of Sources" shows that the Second Defendant worked from a range of publicly available sources as well as a limited number of anonymous individuals who have not been identified for obvious reasons. He submitted that the Second Defendant was carrying out bona fide journalism in a responsible manner. He further submitted that Publication 1 was corrected (it was, but only in an inconsequential way) and that the Claimant's position was fairly put in Publication 8.

90.  Reflecting on these submissions since the hearing, I have concluded that the Claimant's primary case on malice is a synthetic edifice which has no basis in substance.

91.  First of all, I cannot accept that there is anything suspicious about the rapidity in which Publication 1 was put together by the Second Defendant. Whether it was 3 hours and 18 minutes or 4 hours and 18 minutes, that was sufficient time in my view for the Second Defendant to assemble a relatively short piece inspired by Ms Bertrand's article in *Politico* and based also on the other sources to which he has referred. The contention that the Second Defendant must have been provided with information by Ms Bertrand before 5th June is far-fetched. Not merely would Ms Bertrand have had no reason to assist the Second Defendant in a competitive arena, the thinly-veiled suggestion that she too was operating under the influence of the Israelis is fanciful.

92.  Secondly, the timings do not bear out the Claimant's case. There is no evidence that *Forensic News* was set up as early as 20th April, as Mr Callus submitted. The Defendants' version, put forward via PD, is that the website was "formally launched" on 20th May. According to para 17 of SR's second statement, the first publication online was on 5th May, and as I have said there were 6 website pieces before 5th June and all of these were on subjects other than the Claimant. Whatever the evidential uncertainties

here, I cannot accept the Claimant's argument that the decision to begin *Forensic News* was rooted in the collapse of a mediation in Israel.

93. Overall, there is no evidence to support the proposition that the First Defendant was set up, effectively at the instance of Raviv Drucker, acting through Oren Persico or otherwise, to launder the Claimant's information into the public domain. The First Defendant had not started life publishing articles about the Claimant, and the Second Defendant's email to Raviv Drucker dated 8th July – long after the First Defendant was incorporated – indicates that there had been no previous communication between the two men. There is no reason to doubt the Second Defendant's evidence, imparted as it is through PD, that Raviv Drucker did not reply to that email. Mr Drucker was the likely source for the archive published on *Seventh Eye*, but I cannot accept that, because Mr Persico emailed the Second Defendant on 16th July (i.e. only eight days after the Second Defendant's email to Mr Drucker), an inference is capable of being drawn that the Mr Drucker was using the Second Defendant to put the Claimant's data into the public domain. Mr Persico did no more than provide a hyperlink to a cache of documentary material which was by then already public. He may have thought that the Second Defendant would aid in its dissemination, but he was almost certainly now amongst many and none of this is evidence of malice. To the extent that Mr Callus was suggesting that the *Seventh Eye* material had been provided to the Second Defendant *before* the emailed hyperlink was provided, because slightly less than 48 hours would have been insufficient to enable a hoard of documents to be translated from Hebrew to English and Publication 3 to be written, I cannot agree that there is any evidence to support such speculation. This material could have been translated very speedily using Google Translate, if not necessarily with 100% accuracy.

94. The drawing of an adverse inference on the basis of *Armorie's* case requires a measure of caution. In that case the strongest could be presumed, reflecting the language of the brief law report, because the dimensions of the missing jewel were known. I can accept that the First and Second Defendants are remiss in failing to explain why the messages are no longer available. Even if it were arguable that these messages were deliberately deleted at a stage when the Defendants had been put on notice of a possible claim, I consider that it would be a step too far to draw the inference that these messages were deleted because they would show that Raviv Drucker was behind Oren Persico.

95. Mr Callus' various submissions directed to the quantity, quality and tone of the various publications were all rooted in the overarching submission that the Second Defendant was the cat's paw of Raviv Drucker. The Particulars of Claim do not allege that an inference of malice could be drawn merely from the sheer number of falsities and gross fact-checking failures, that is to say independently of the allegations about Mr Drucker. In the circumstances it is unnecessary for me to comment further save to observe that, had I concluded that the Claimant's conspiracy theory was close to having a real prospect of success, I would have been content to recruit Mr Callus' submissions about the quantity and quality of the publications to carry the Claimant's case over the line.

96. The Claimant's case would be more arguable if (1) the timings bore him out, and (2) the archive was not already in the public domain when the hyperlink was sent to the Second Defendant. Overall, I agree with Mr Price that the Claimant's malicious falsehood claim is based on little more than wild speculation.

97.     The claim in *Loutchansky* malice is equally thin. It is true that SR categorically denied a number of allegations on behalf of his client, but in doing so he provided no detail and no evidential fortification. In my judgment, SR did not provide sufficient information such that subsequent publications on the same topics carried the risk of a finding of malice. Furthermore, it would not be right in my opinion to read anything into the Second Defendant's failure to reply to SR's letter dated 6th June 2020, still less an inference that he knew that his stories lacked evidential foundation. The instant case does not resemble *Flood v Times Newspapers* [2009] EWHC 2375 (QB), [2010] EMLR 8 and *Qadir v Associated Newspapers* [2012] EWHC 2606 (QB), [2013] EMLR 15. There is marginally greater force in Mr Callus' submission that the Senate Intelligence Committee's report had little to say about the Claimant, but I was not asked to consider the scope of the evidence it received and its terms of reference were much narrower than the scope of Publications 1-8.

98.     Mr Price had a further submission based on s.3 of the Defamation Act 1952. In *Tesla Motors Ltd v BBC* [2011] EWHC 2760 (QB), Tugendhat J held, at para 66:

> "In my judgment if a trader, such as each of the Claimants in this case, makes a claim for malicious falsehood and, as he is entitled to do, he relies not on any actual damage, but on probable damage such as is referred to in the 1952 Act section 3, the Claimant must nevertheless give particulars of the nature of the allegedly probable damage and the grounds relied on for saying that it is more likely than not. For example, if what is relied on is the probability of such a trader having to incur expenses in advertising and other forms of publicity in order to counter the effects of the alleged falsehoods, then the Particulars of Claim should identify that probable damage. On the other hand, the damage which, it is said, is more likely than not to be a consequence of the alleged falsehood, may be delay in sales of a given number of vehicles, or loss of sales of a given number of vehicles, or the difference between the price at which vehicles will be saleable following publication of the falsehood complained of and the higher price at which it is said they would probably have been saleable but for the publication of the falsehood complained of. In such cases, then the Particulars of Claim should likewise identify that probable damage."

99.     The high point of the Claimant's case on loss appears in para 57.3 of the Particulars of Claim. This asserts, without giving particulars, that the Claimant has incurred "considerable expenses" in meeting the concerns expressed by the Compliance Departments of banks. In my judgment, this is too vague an averment to amount to the giving of particulars of the allegedly probable damage as required by Tugendhat J. It follows that the claim in malicious falsehood also fails at the hurdle of s.3 of the 1952 Act.

*The Third Issue: Harassment*

100.    The sole issue which arises is whether the social media publications taken as a whole arguably amount to a "conscious or negligent abuse of press freedom": see Warby J in *Sube v NGN* [2020] EWHC 1125 (QB), [2020] EMLR 25 at H8 (see also, *Scottow v*

*CPS* [2020] EWHC 3421 (Admin) and *Hayden v Dickinson* [2020] EWHC 3291 (QB), para 44 in particular). Given the height of the bar, Mr Callus realistically accepted that his task was difficult.

101.    According to para 49 of the Particulars of Claim, the social media publications amount to a "concerted campaign of cyber-bullying". According to PD, para 89, only a small proportion of the Defendants' postings on social media related to the Claimant.

102.    Overall, I do not think that the tweets do much more than draw attention to the publications on the First Defendant's website, albeit in a self-congratulatory manner, for the purpose of drawing in potential readers. The language deployed is certainly not understated, as befits perhaps the nature of the medium, but it cannot fairly be described as a campaign of harassment. The only reasonable inference is that the Defendants were exercising their rights of free speech against someone whose activities they believed merited being placed in the public domain. There is no tenable basis for concluding that the Defendants may have been animated by motives separate from a bona fide journalistic enterprise, even if that enterprise may have misguided or a substantial number of untruths were published, as to which no judgment can fairly be made at this stage.

103.    Overall, I am unable to conclude that there is a real prospect that the Claimant might demonstrate at trial that the Defendants have perpetrated an abuse of press freedom.

***The Fourth Issue: Misuse of Private Information/Privacy***

104.    The Claimant's case in the tort (see *Vidal-Hall v Google* [2015] EWCA Civ 311, [2016] QB 1003, para 61) of misuse of private information/privacy is based on the First to Fifth Defendants' publication of all the material appended to the Particulars of Claim as well as four photographs in respect of which he asserts a reasonable expectation of privacy. According to para 40 of the Particulars of Claim, three of the photographs were "ripped from the social media accounts of a child in his family". In Publication 5, the transcript of the podcast, it was said that they were provided by a source, RU. According to para 149 of PD, these photographs were obtained from open social media accounts of the Claimant's family members, and the fourth was obtained from an article published in *The Telegraph*. The copy of the article on the online edition of *The Telegraph* which has been provided does not in fact contain a photograph. These photographs were described by the Defendants as "the first images ever published" of the Claimant. Images of his children were pixelated. According to para 150 of PD, in one instance one of the photographs was also published on the Second Defendant's private twitter account. The point has already been made that the Defendants knew or believed the Claimant to be someone who did not welcome publicity.

105.    The issue is whether this material arguably falls within the "intrusion limb" of the tort of privacy, as opposed to the "confidentiality limb". The relevant principles were set out in the decision of the Supreme Court in *PJS v NGN* [2016] UKSC 26, [2016] AC 1081, per Lord Mance JSC at paras 25-32 and Lord Neuberger PSC at paras 58-64. On the facts of that case, PJS's right to private life under article 8 of the Convention embraced the right to prevent unwanted intrusion into his personal space; and, in particular, publications of purely private sexual encounters where there could be no countervailing public interest.

106.    As Mr Callus points out, information which is technically available to the public online can still be information in which an individual enjoys a reasonable expectation of privacy against mass dissemination. For example, in *Green Corns Ltd v Claverley Group Ltd* [2005] EWHC 958 (QB), [2005] EMLR 31 Tugendhat J concluded that there was such a reasonable expectation in relation to addresses which were available on HM Land Registry.

107.    In *Yeo v Times Newspapers* [2015] EWHC 2853 (QB), Warby J held, at para 14, that article 8 extended to the right to reputation if the infringement were sufficiently serious.

108.    In my judgment, there is a clear difference here between the photographs and all the other material on which the Claimant relies for the purposes of this particular claim. As Mr Price accurately observes, Part 53 BPD53, para 8.1 sets out the pleading requirements for a claim for misuse of private information. The Claimant must specify (1) the information in respect of which he claims to have, or have had, a reasonable expectation of privacy, (2) the facts and matters upon which he relies in support of that contention, (3) the use alleged to be a misuse, and (4) any facts and matters upon which he relies in support of his contention that his article 8 rights outweigh the Defendants' article 10 rights.

109.    The Particulars of Claim fail to meet these requirements as regards the material set out in Appendices 1 and 2. Given that this material is far from being homogenous, it is not appropriate in my view to throw everything into the claim in an undifferentiated and indiscriminate manner. Even if it were possible to identify individual elements of a sustainable claim for misuse of private information within this morass, the Claimant has not undertaken the exercise mandated by the practice direction and I agree with Mr Price that it would be oppressive to allow him to serve this claim out of the jurisdiction on the basis put forward.

110.    As I have said, the photographs fall into a different category. It is contended by Mr Price that they were all sourced from the public domain, none of the photographs appear to depict the Claimant in any private capacity, and "the assertions made by the Claimant in this case in relation to the photographs do not give rise to an actionable misuse". I am not entirely persuaded by this. In particular, the circumstances in which the photographs were taken, and then obtained by the Defendants, are not clear, and it is arguable that they do depict the Claimant in a private or personal setting, along with family members, whose faces we cannot see. Whether these publications were sufficiently intrusive entails a fact-sensitive balancing exercise. On the evidence currently available, I do not consider that this exercise can be performed in a manner which defeats this claim.

111.    That the Claimant has a real prospect of success in establishing a breach of his article 8 rights is insufficient for his purposes. Aside from issues of *forum conveniens* (see the Sixth Issue below), the court retains a discretion in service-out cases. A claim limited to the photographs would not justify this discretion being exercised in the Claimant's favour. He therefore needs to succeed on his libel claim, to which I now turn.

***The Fifth Issue: Libel***

112.    Section 9 of the Defamation Act 2013 provides in material part:

"**9 Action against a person not domiciled in the UK or a Member State etc**

(1) This section applies to an action for defamation against a person who is not domiciled—

(a) in the United Kingdom;

(b) in another Member State; or

(c) in a state which is for the time being a contracting party to the Lugano Convention.

(2) A court does not have jurisdiction to hear and determine an action to which this section applies unless the court is satisfied that, of all the places in which the statement complained of has been published, England and Wales is clearly the most appropriate place in which to bring an action in respect of the statement.

(3) The references in subsection (2) to the statement complained of include references to any statement which conveys the same, or substantially the same, imputation as the statement complained of."

113.   Given the domicile of the Defendants, s.9 clearly applies. It replaces classic *forum conveniens* in the context of a libel claim. Mr Callus submitted that there is little difference between the test in the *Spiliada* and *Altimo* for classic *forum conveniens* and the test under this provision.   It is correct that in both cases the legal burden of establishing that England and Wales is *clearly* the most appropriate jurisdiction rests on a claimant.   Plainly, there is a substantial overlap: the former focuses on where is clearly the most appropriate jurisdiction for trial of the action pleaded by the claimant whereas s.9 looks at where is clearly the most appropriate jurisdiction in which the claimant could bring an action, in the context of all the places the statement(s) (or, if sub-s. 9(3) applies, similar statement(s)) was or were published). Despite the rule in *Berezovsky v Michaels* [2000] UKHL 25, [2000] 1 WLR 1004 that a claim in defamation must be confined to publications in this jurisdiction, s.9 requires a comparative analysis of publications in all relevant jurisdictions.

114.   In *Ahuja v Politika Novina I Magazini D.O.O. and others* [2015] EWHC 3380 (QB), [2016] 1 WLR 1616, at para 31, Sir Michael Tugendhat cited with approval *Gatley*, at para 24.29:

"…the effect of s.9 will be to oblige the court to consider all the jurisdictions where the defamatory statement has been published, in order to determine whether the domestic jurisdiction is clearly the most appropriate place in which to bring the action. As the Explanatory Notes to the Act make clear, "… if a statement was published 100,000 times in Australia and only 5,000 times in England that would be a good basis on which to conclude that the most appropriate jurisdiction in which to

> bring an action … was Australia rather than England". However, the extent of publication in different jurisdictions may have little bearing on where the claimant's reputation mainly lies and on where that reputation has been most seriously damaged, and the Explanatory Notes rightly suggest that the court would wish to take into account such matters as the amount of damage to the claimant's reputation in England and Wales compared with elsewhere, the extent to which publication was targeted at a readership in England and Wales compared with elsewhere, and whether there was reason to think that the claimant would not receive a fair hearing elsewhere. No doubt the court will also wish to consider such factors as the convenience of witnesses and the relative expense of suing in different jurisdictions. It would be unsurprising if claimants resident in England and Wales were to surmount the new threshold more readily than foreign claimants."

115. This passage makes it clear that in coming to the overall assessment required by s.9 it is necessary to consider a range of factors including where the publications mainly occurred, the primary seat of a claimant's reputation, and other pragmatic issues bearing on the convenience of the parties.

116. In *Wright v Ver* [2020] EWCA Civ 672, [2020] 1 WLR 3913, Dingemans LJ enumerated, at paras 61-66, the factors that should be assessed under s.9. These included:

(1) All the jurisdictions in which the relevant statement had been published.

(2) The number of times on which a statement has been published in each jurisdiction.

(3) The amount of damage to the claimant's reputation in England and Wales compared with elsewhere.

(4) Whether particular readers here were targeted.

(5) The availability of fair judicial processes in the other jurisdictions in which publication occurred, the availability of remedies, language barriers, the costs regime, and the location of likely witnesses.

117. In *Wright*, at para 60, Dingemans LJ held that the standard of proof was the balance of probabilities. Following the hearing, I invited written submissions from the parties as to whether the application of the civil standard of proof could be squared with Hamblen J's holding in *AstraZenica* (see §42 above) that the "good arguable case" test operated. Dingemans LJ's observation was *obiter* because the contrary was not fully argued.

118. I pay tribute to Mr Callus' elegant and sophisticated argument. In essence, he submitted that para 60 of Dingemans LJ's judgment in *Wright* was incorrect, and that the "good arguable case" test should apply whenever the court is determining a jurisdiction application on an interlocutory basis. Further, he contended that there could be no difference between the test applicable to *forum conveniens* and s.9.

119.  I do not consider that any lengthy disquisition is required on this occasion: the upshot would be the same in these particular circumstances whichever test were applied. Moreover, the application of a test less favourable to the Claimant does him no harm, given my eventual conclusion on the s.9 question.

120.  I confess that initially I was of the view that there should be no difference between *forum conveniens* and s.9, and that there is a measure of good sense in the court applying the "good arguable case" approach to an adjudication which is being carried out on an interlocutory basis. Ultimately, though, I have concluded that Mr Price's submissions on this issue are correct, largely because there is no distinction between subject-matter jurisdiction cases arising under s.10 of the 2013 Act and under s.9. Both provisions require the court to be "satisfied". In *Brett Wilson LLP v Persons Unknown* [2015] EWHC 2628 (QB), [2016] 4 WLR 69, paras 20-23, and *Pirtek (UK) Ltd v Jackson* [2017] EWHC 2834 (QB), paras 27-38, Warby J applied the ordinary civil standard of proof to s.10. I accept Mr Price's submission that s.9 is a distinct parallel regime whose requirements must be met by a claimant independently of issues as to service and personal jurisdiction.

121.  In *Wright* Dingemans LJ held on the particular facts that England and Wales was not clearly the most appropriate jurisdiction to bring the action. The majority of the publications were in the US and Dr Wright had a global reputation. At para 72, Dingemans LJ stated that the fact that the internet publications were centred in the US "strongly suggests that a State in the US is likely to be the most appropriate jurisdiction in which to bring the claim". There was expert evidence at trial as to the availability of remedies for libel in the US courts. Dingemans LJ addressed that issue at paras 78-80:

> "78. Seventhly the evidence established that the Courts in the US would have jurisdiction over the claim made by Dr Wright against Mr Ver, who had consented to the jurisdiction of the US Courts. Although the evidence did not address the specifics of remedies available to Dr Wright in each respective state in the US beyond the statement that New York was a Court of "general jurisdiction", there was nothing in the evidence to suggest that Dr Wright would not be able to obtain damages to vindicate his reputation in any state for all the relevant publications in the US. Although Mr Wolanski attempted to sub-divide the publications in the US according to each individual state it was not apparent that this point had been taken before the judge, but more importantly there was no evidence suggesting that any state in the US which would accept jurisdiction would not be able to provide Dr Wright with an adequate remedy for the totality of the publications in the US. There was no evidence showing that Dr Wright would have difficulties in obtaining access to justice in any state in the US beyond his unexplained hearsay assertion that he had been told that it would be difficult.
>
> 79. Eighthly there was no evidence that any relevant witness would have difficulty in providing evidence in any state in the US, but it might fairly be noted that neither party had provided details of relevant witnesses or made any effort on the evidence to identify what were the likely issues.

80. In all these circumstances in my judgment, on the evidence before the judge, a state in the US which would accept jurisdiction over this claim, which includes California, is the most appropriate jurisdiction in which to bring this claim."

In a situation where Dr Wright had a global reputation it could not be said that the seat of his reputation was located in any particular jurisdiction. There was no prejudice to him in requiring him to bring his action in a State in the US rather than anywhere else.

122.     Mr Callus, having appeared for the unsuccessful appellant in *Wright*, did take the point that Publications 1-8 should be segregated as between various States. His headline submission was that the Defendants shouldered at least an evidential burden that any particular State in the US could provide a remedy that was both available and appropriate. The absence of expert evidence (cf. *Wright*) meant that this evidential burden could not be discharged in both these respects.

123.     In support of the proposition that an evidential burden existed, Mr Callus relied on the following authorities and sources.

124.     It is well-established that foreign law is a matter of fact that must be proved, ordinarily by expert evidence: see *Dicey*, Chapter 9, paras 9-002 and 9-013 in particular.

125.     In *AstraZeneca*, Hamblen J held, at para 39:

"Although it was ultimately always for the claimant to show that it is a proper case for service-out, where this is disputed by the defendant on a specific ground such as the existence of a jurisdiction agreement which it is alleged obliges the claimant to bring the claim before the courts of another country, it is for him to establish the agreement, its scope, applicability and validity rather than for the claimant to prove a negative."

126.     In *Qatar Airways* Saini J held, at paras 351-53:

"A defendant challenging jurisdiction must identify another candidate, which does have jurisdiction to determine the dispute, and the question will be tested by reference to the identified candidate: Unwired Planet v Huawei (SC) [96]. The other candidate must be an "available" forum, in the sense that the dispute must be capable of being tried there: Unwired Planet v Huawei (SC) at [96]-[98].

352.     It was common ground that "appropriateness" is a wider concept than natural forum, in the sense of the most closely connected forum, and is a central part of the assessment: Cherney v Deripaska [2009] 2 CLC 408 [12]-[23]. So, for example, England can be the most appropriate and proper forum even if not the natural forum, if there are factors that show the natural forum is a less appropriate forum than England [20]. And another forum will not be appropriate, even if the forum most closely connected to the dispute, if there is a real risk that

substantial justice will not be obtainable there: <u>Lungowe</u> at [88]; <u>Cherney</u> at [26].

353.    Given the arguments on the facts made to me, I need to say a little more on the legal approach to the consideration of the risk that substantial justice will not be obtained. This matter is essentially concerned with well-known "fair trial" considerations: corruption, unfairness, or other inherent defectiveness of the foreign legal system. Bearing in mind the respect due to foreign courts, "cogent evidence" is required of a "real risk" of this: <u>Cherney</u> at [14], [27]-[28], [29], [44], [60]."

127.   Finally, in *Livingstone Properties Equities Inc v JSC MCC Eurochem* [2020] UKPC 31, Lady Arden giving the judgment of the Privy Council held, at para 12:

"When assessing whether there is another more appropriate forum, the court will consider what connecting factors exist in relation to that forum, such as the place where the alleged wrongs were committed and the governing law of the pleaded claims. The governing law is an important factor because it is generally preferable that a case should be tried in a country whose law applies … If there is no other available forum which is clearly more appropriate the court will ordinarily refuse a stay."

128.   In the light of the authorities, including in particular *Wright v Ver*, Mr Callus submitted that it is clear that the epicentre of the Claimant's reputation is England and Wales. In conformity with the jurisprudence on "centre of interests", Mr Callus argued that the centre of gravity of this dispute was here and not in the US. Furthermore, the applicable law was English law and the claim has been confined, as it must be, to publication in this jurisdiction. In *Berezovsky*, Lord Steyn stated that the place where in substance the tort arises "is a weighty factor pointing to that jurisdiction being the most appropriate one".

129.   Mr Callus further submitted that the burden was on the Defendants to show that there was a US State which would accept jurisdiction in respect of a claim brought by an English-domiciled Claimant against any particular Defendant, and that this burden has not been discharged. Furthermore, there are significant juridical advantages in bringing a claim here, and the Defendants have failed to show that anything similar exists in the US. These include the availability of specific remedies (e.g. orders under ss.12 and 13 of the Defamation Act 2013), the ability to obtain orders for costs against the losing party, and trial by judge alone. There is no evidence as to what remedies are available in any particular US State, what the Claimant would need to prove to succeed, what defences may be available, and what advantages, if any, inhere in bringing a claim there rather than here.

130.   Mr Price submitted that by far the majority of the publications took place in the US. Although the Claimant is a British citizen who is domiciled here, he appears to be a man of very substantial means who has not always lived in the UK, and whose personal and business interests "can accurately be said to transcend national boundaries". He is of interest to the US Senate Intelligence Committee, he is a friend of the Israeli Prime Minister, he owns substantial property assets in the US and elsewhere, and has brought

several libel actions in both Israel and the UK. Mr Price submitted that the Claimant's failure to adduce evidence of his global reputation, or indeed of the extent of his reputation in England and Wales, should disqualify him from proceeding because the court is disabled from properly undertaking the fair assessment as required by s.9. In this regard it is highly relevant, he argued, that the Claimant has failed to respond to the Defendants' solicitors' letter dated 24th November 2020.

131. Mr Price did not accept that there was any evidential burden on his clients in these circumstances. *AstraZeneca* was a case where a discrete issue arose as to the existence of a jurisdiction agreement. It is therefore authority for a very limited principle.

132. Mr Price further submitted that there is an immediate imbalance in convenience in that trial in England and Wales would involve the five Defendants, who are domiciled in disparate parts of the US, in having to travel to the UK. They are being required to take on a Claimant with substantially greater means and resources. The Claimant has not said that he is unable to achieve his objectives in the US, and in the absence of evidence to the contrary the presumption must be the substantive law of the US is the same as English law.

133. In oral argument, Mr Price submitted that "if backed into a corner" he would accept the proposition set out in para 39 of the Particulars of Claim that a public figure suing for defamation in the US must prove express malice, in accordance the doctrine in *New York Times v Sullivan* [1964] 376 U.S. 254. He observed that it was the Claimant's case that the Defendants were acting maliciously, in which circumstances he is not being placed at any real disadvantage.

134. Mr Price did not submit that the Defendants' failure to obtain expert evidence was due to their lack of resources. Even if it were, that is a not a factor that I can take into account.

135. My point of departure must be to consider and assess the nature and extent of the Claimant's reputation in England and Wales. I have already touched on this, but paras 153-58 of PD need to be added to the mix. In 2010 the Claimant founded USG Security Ltd with offices in Central London. According to the Claimant's LinkedIn page, this is a business with worldwide interests, having provided its services in Russia, Mexico and Switzerland and for several "world airlines". According to PD, the Claimant owns or controls a network of companies across multiple jurisdictions including BVI and Florida. Playland Investments LLC is a property company based in Florida, and is presumably where the Claimant's "passive investments" are located. The US Senate Intelligence Committee reported on the Claimant's business relationships with Russian oligarchs and Psy Group, a private Israeli intelligence company.

136. Publication 5, the transcript of the podcast, mentions that the Claimant has owned properties in the UK for over 30 years but it has not been possible to drill down into these.

137. Mr Price invites me to draw an inference from the Claimant's failure to adduce adequate evidence of his reputation both here and overseas: in short, it is said that I should infer that his reputation is a global one.

138. In my judgment, the Claimant has been far from forthcoming about his business interests both here and overseas. Para 57 of the Particulars of Claim is couched in very general if not emollient terms. I appreciate that the Claimant wishes to safeguard his privacy and that in the particular world in which he operates he could lose credibility if he were required to say too much about himself and his business interests, ostensibly as a precondition to bringing proceedings to vindicate his reputation. Even so, what little that has been said emerges vicariously through his solicitor, and in my view he could have afforded me much greater assistance. In particular, it would have been useful to know whether USG Security Ltd is his sole business in the UK, barring investments in property, as well as the number and/or percentage of its clients who are based here rather than in Russia, Israel and elsewhere. The impression given is of excessive reticence bordering on secrecy.

139. The air of mystery that surrounds the Claimant is not a factor that is entirely to his forensic detriment. He is entitled to be private and to seek to maintain a "ghostly" internet presence. Having a low profile or not, the Claimant must have a reputation somewhere. On the other hand, the Claimant's secrecy adds support to the Defendants' argument that, even if he is not necessarily hiding something, he has not been open with the court. Accepting the rhetorical flourish in the use of "epicentre", the term says little about the length of the radius of this notional circle.

140. Notwithstanding the forensic mileage that accrues to the Defendants' advantage from this state of affairs, I do not think that Mr Price did enough to contradict the Claimant's evidence, given through his solicitor, that his personal and business life is centred in this jurisdiction, even if a significant number if not proportion of his clients are based overseas.

141. In my judgment, the instant case is somewhat *sui generis*. I do not think that the Claimant's reputation may fairly be described as "global". In *Berezovsky*, at page 1023A, Lord Hoffmann observed that on the particular facts the claimant's reputation in England and Wales was "an inseparable segment of his reputation worldwide". The same was true for Dr Wright. But in my opinion this aphorism does not fairly apply to the Claimant. Despite the evidential *lacunae*, England and Wales may be identified as the place where the Claimant's reputation is most obviously centred.

142. As I have said, *Berezovsky* and *Wright* were both cases where it was not possible to say that the claimant's reputations were centred anywhere in particular. However, they were also cases where the claimants could not demonstrate on the evidence that their reputations were centred in this jurisdiction, and insofar as they did have a reputation here it could not be separated from their global reputation. In my judgment, another reason for concluding that the Claimant's reputation is centred here is that the available evidence does not demonstrate it is centred anywhere else.

143. The proposition that it might be centred in Israel, or at least have a significant foundation there, is belied by SR's evidence and the ruling of the Supreme Court of Israel that the courts of that jurisdiction were not the appropriate forum to litigate the libel action against the Sixth Defendant. The Supreme Court's judgment has not been made available, but it is reasonable to assume that, as between Israel and the US, the latter was deemed to be the more appropriate forum.

144.  The proposition that the Claimant has a significant reputation in the US is difficult to accept. It was inevitable that the US Senate Intelligence Committee's interest in the Claimant would generate some publicity – largely of course in the US. That publicity has been magnified by the activities of the Defendants. But none of this shows that the Claimant has a significant reputation in the US generally or in any State in particular. Beyond having investments in a Floridian property company, his profile is exiguous. The Defendants' activities may well give the Claimant the right to sue in the US, but that is not the same thing as saying that he has a substantial reputation there to protect.

145.  Given the extent of publication in England and Wales, the Claimant has a convincing argument that he has suffered serious harm to his reputation within the meaning of s.1 of the 2013 Act, and on my understanding Mr Price did not suggest otherwise. This is so notwithstanding the mantle of secrecy that the Claimant has chosen to don.

146.  The next issue that arises is the extent of publication in other jurisdictions. Technically, each State in the US is a separate jurisdiction for these purposes. Although there is no expert evidence about this, as I explain more fully below it would defy common sense to hold that the State of California would not accept jurisdiction for all publications in the US, which was the reasoning Dingemans LJ gave in *Wright* (albeit specifically directed to the State of New York).  It follows, in my judgment, that the appropriate comparison should be between publication in England and Wales on the one hand and publication throughout the US on the other. The majority of the publications took place in various US States and these may fairly be aggregated for present purposes.

147.  Putting the matter in these terms also serves to illustrate the perhaps obvious point that the Defendants and such witnesses they may choose to call on the public interest defence or more generally are all in or likely to be in the US, and that it would be inconvenient to say the least for them to be constrained to litigate in the courts of England and Wales. Given the disparity in resources, the inconvenience to the Claimant in litigating in the US would not be as great as the inconvenience to the Defendants in litigating here.

148.  It follows that I cannot accept the zenith of Mr Callus' submission that the absence of expert evidence should lead to the conclusion that the Defendants fail at first base, as it were, in the context of their argument that a US court is available. I see no reason why regard cannot be had to Dingemans LJ's conclusions in *Wright* provided that care is taken not to overapply them.  It is true that in *Wright* the express finding was that the State of New York would accept "general jurisdiction" and nothing was said about any other State. However, in my view sensible inferences may be drawn about this. The First Defendant is incorporated in California and the Second Defendant, its prime mover, is resident there. It is possible that other US States would accept jurisdiction but I do not have to make a finding about that. It is sufficient for these purposes, accepting Mr Callus' submission that a specific State does have to be identified, that California steps forward as being the entirely obvious candidate. The absence of expert evidence on this topic is not fatal to the Defendants.

149.  On the other hand, I agree with both counsel that the court cannot take judicial notice of any aspect of US substantive and procedural law in circumstances where there is no evidence.

150.    The issue of appropriateness must now be considered. As Saini J pointed out in *Qatar Airways*, the natural forum for this dispute may not be the most appropriate forum, and *vice versa*. There is a degree of circularity about natural forum because the law of England and Wales as the law governing the dispute depends to some large extent on where the issue is being determined. Would a California court hold that the law of England and Wales should govern a claim limited to publication in England and Wales, or would this in any case depend on whether the Claimant, if forced to sue 5,000 miles away, expands the ambit of this claim to include publications in the US?

151.    I have already listed the factors pointing to a libel claim initiated in England and Wales having obvious attractions to the Claimant. Apart from the practical advantages inherent in litigating in his country of nationality and residence, and the corresponding practical disadvantages to the Defendants, a wealthy claimant would prefer a system which requires as the normal rule that the losing party pay the costs, and where the court's remedial armamentarium is substantial. The absence of any evidence as to the system of libel law and practice in California makes it impossible to make any meaningful comparisons. This is not a situation where the court may adopt the working hypothesis that foreign law matches domestic law. It would be absurd in these circumstances to assume, for instance, that Californian law offers the same remedies as exist under the Defamation Act 2013 and has the same costs regime, to take just two examples, in the absence of evidence to the contrary.

152.    In this context I must return to para 78 of Dingemans LJ's judgment in *Wright*. In a case where the trial judge had expert evidence available, Dingemans LJ observed that there was no evidence suggesting that any State in the US which would accept jurisdiction would not be able to provide Dr Wright with an *adequate* remedy. That was in the context of a claim in the US for the totality of the publications in the US brought by someone who had a global reputation – and one which by definition would include the US.

153.    However, the Claimant is not seeking to recover damages for publication in the US: his whole case is that the main repository of his reputation is England and Wales. If required to bring his action in a California court, I think that it may be concluded, consistently with *Wright*, that the Claimant could at least in principle sue in respect of reputational damage sustained in the US (and not just California), but could he sue in respect of reputational damage sustained here?

154.    There is no evidence either way as to whether the Claimant could sue in California for damage to his reputation sustained in the United Kingdom. This cannot be a question of reaching common sense conclusions. I agree with Mr Callus, applying the authorities I have cited at §§124-127 above and rejecting Mr Price's submission that *AstraZeneca* is not of general applicability, that it was incumbent on the Defendants to adduce some evidence about this, and that their failure to do so means that I must conclude that suing in California would significantly disfavour the Claimant. Para 78 of Dingemans LJ's judgment in *Wright* is therefore insufficient for the Defendants' purposes. Although I would be prepared to assume that the courts of California have "general jurisdiction" in relation to publications made in the US, there is no evidence that this concept covers damage sustained outside the US altogether.

155.    Even if I were wrong about the existence of an evidential burden, and the Claimant were somehow able to sue in California for reputational damage sustained here, there

is the unresolved issue as to which law would govern the claim. As a matter of basic common sense, it seems obvious that the Claimant would be better off suing for reputational damage in England and Wales in these courts rather than in the courts of California.

156.   Another way of considering this issue is to turn it round 180 degrees and ask the question whether, if compelled to sue in California, the Claimant could receive an adequate remedy for reputational damage sustained in the US. Dingemans LJ's conclusion that a US court would deliver an adequate remedy for Dr Wright was predicated on the finding that he enjoyed a global reputation. It is possible that a US court could in fact provide an adequate remedy for an individual without a global reputation and any significant presence in the US. But that would depend on principles of Californian defamation law, including in particular what is meant by "general jurisdiction", and whether there are local analogues to *Berezovsky* and s.1 of the 2013 Act, about which there is no evidence. Again, there is an evidential burden that the Defendants have failed to discharge.

157.   Overall, therefore, I conclude that the Defendants' failure to discharge the evidential burden on key issues means that the Claimant, if compelled to litigate in California, would not receive an adequate remedy for reputational damage sustained in England and Wales.

158.   Mr Price's fall-back position, if he were pushed into the metaphorical corner, does not provide a ready solution. Even on the assumption that the Claimant has become a "public figure" in the US, (1) it would be harder for him to prove express malice (as I have found) than to sue here, and (2) the difficulty remains surrounding a claim for reputational damage sustained outside the US altogether.

159.   The defence of public interest is expressly relied on by PD. Its parameters and scope under the law of England and Wales are familiar. There is no evidence that public interest operates as a discrete defence in any US State. It is likely that the public interest is catered for in a different way by the rule in *New York Times v Sullivan*: public figures have to prove express malice and private figures do not. Whether the Claimant would be regarded as a public figure raises an issue of Californian substantive law as to which there is no evidence. I do not interpret the Particulars of Claim as conceding that the Claimant would be so regarded. The Defendants' inability to discharge the evidential burden on this issue is another reason for concluding that they cannot establish that the balance of juridical advantage from the Claimant's perspective favours litigation in the US.

160.   No mention is made in PD of the defence of truth. If that omission is intentional, nothing turns on the point. If it is not, there is no evidence that truth operates as a defence in any US jurisdiction, and in a system which places especial emphasis on the right to freedom of speech there is no room for drawing common sense conclusions as to what the local law might be. On that hypothesis, the Defendants are better off in the courts of England and Wales.

161.   I must now return to para 72 of Dingemans LJ's judgment and his observation that the preponderance of publication in the US is a strong factor militating in favour of a US State being the most appropriate jurisdiction to bring the claim (I am adapting what Dingemans LJ said to reflect the fact that Mr Callus has taken a point that appears not

to have been taken in *Wright*). Para 72 reflects para 66 of the Explanatory Notes to the 2013 Act. The question arises as to whether this factor is less weighty in circumstances where, unlike Dr Wright, the Claimant's reputation is not global but centred in England and Wales, and in any event it has not been established that a claim for reputational damage suffered in the US could attract an adequate remedy. In my judgment, the preponderance of publication being outside England and Wales must constitute a less weighty countervailing consideration in these particular circumstances.

162.    I have mentioned the difficulties to the Defendants of being required to litigate in this jurisdiction. At a purely instinctual level, it seems unfair that the Defendants should be compelled to do this: after all, these are not their claims. On the other hand, I consider that these difficulties should not be overstated. The experience of the last ten months or so has demonstrated that trials can take place perfectly fairly and efficiently without parties being present. Instructions can be given remotely. Wherever this libel claim is tried is likely to involve a flexible use of modern technology.

163.    The Defendants having identified a Californian court as an appropriate candidate, the burden is on the Claimant to satisfy me on the balance of probabilities that the courts of England and Wales are clearly the most appropriate place to bring the action. Some weight must be accorded to the use of the adverb "clearly": if, for example, the balance came down slightly in the Claimant's favour, the onus would not be discharged.

164.    Ultimately, I have concluded that the Claimant has discharged the relevant burden. The Claimant is a British citizen whose personal and business interests lie principally within this jurisdiction. He seeks remedies in respect of harm to his reputation which is centred within this jurisdiction. The claims relate to publications here and nowhere else. He is not a libel tourist. Most significantly, the Defendants have not discharged the evidential burden as to whether a Californian court would countenance a claim for reputational harm suffered in England and Wales, or as to whether a remedy in the US would be adequate in these circumstances. There are other evidential burdens the Defendants have failed to discharge. All these factors, taken cumulatively, fall to be balanced against those which repose in the Defendants' favour, in particular the greater extent of US publication and the inconvenience to them of having to litigate in this jurisdiction. The outcome, in my judgment, is that the courts of England and Wales are clearly the most appropriate place to bring the claim.

### The Sixth Issue: Classic Forum Conveniens

165.    In the circumstances, I can deal with the sixth issue fairly briefly.

166.    In the event that I had concluded that the malicious falsehood and harassment claims could surpass the merits test, I would have concluded that the courts of England and Wales were the most appropriate place to try the actions. This is principally because there is no evidence that these causes of action are recognised in California.

167.    This leaves the misuse of private information/privacy claims in relation to the four photographs. Taken in isolation, these would not have justified service-out of the jurisdiction, but taken in conjunction with the libel claims I am satisfied that it would be appropriate to exercise my residual discretion in favour of the Claimant. He succeeds on *forum conveniens* for the reasons I have outlined under §166 above.

### The Sixth Defendant

168.    The Sixth Defendant claims that he was not served with notice of the date of this hearing by the Claimant. Considering his solicitors' letter dated 14th December 2020 and Mr Callus' submissions in answer to it, I am not satisfied that he was properly served. The Sixth Defendant has said that he was informed by the Second Defendant via a social media message on 4th November "that there may be a hearing on 14-15 December". Although I can safely draw the inference that the Sixth Defendant did nothing to bottom out the position, I am not satisfied that it would be right to proceed in his absence under r.23.11. In any event, his case appears to fall into a slightly different category to the others, and issues arise in relation to Publications 9 and 10 as well as the Sixth Defendant's involvement in the libel and misuse of private information claims which have not been adequately addressed.

### Disposal

169.    In relation to the First to Fifth Defendants, the Claimant's application to serve-out succeeds in relation to the claims in libel and in misuse of private information/privacy (albeit only as regards the four photographs). The Claimant's application fails in all other respects.

170.    I invite the parties to provide written submissions on the issues of relief, costs and the form of Order.